## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 07 2017, 8:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Karl Popowics
Goodin Abernathy, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Nathan B. Maudlin
Klezmer Maudlin, P.C.
New Harmony, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Best Chairs, Inc., *Appellant*, <br><br> v. <br><br> Sheena Matheis, *Appellee*. | July 7, 2017 <br><br> Court of Appeals Case No. 93A02-1611-EX-2480 <br><br> Appeal from the Indiana Worker's Compensation Board <br><br> The Honorable Linda Peterson Hamilton, Chairperson <br><br> Application No. C-229290 |

**Brown, Judge.**

[1] Best Chairs, Inc., appeals from the order of the Indiana Worker's Compensation Board (the "Board") which affirmed the decision of the single hearing member on Sheena Matheis's application for adjustment of claim. We revise and consolidate the issues presented on appeal as whether the Board erred in entering its order. We affirm.

*Facts and Procedural History*

[2] Matheis began her employment with Best Chairs in September 2013 and worked in the off-bearer department where she measured and stacked rails and used a band saw to cut scrap wood. On January 21, 2015, Matheis arrived at work at 6:00 a.m., took a work break from approximately 2:30 p.m. to 2:40 p.m., and when she returned to work took some scrap to cut on the band saw while wearing gloves. As she leaned over to shut the machine off, Matheis noticed that she had sustained a laceration to her right thumb. The laceration did not completely sever her thumb, but her thumb and the glove were hanging. Matheis went to the restroom and wrapped her hand with paper towels. Matheis exited the restroom, encountered her co-worker Kelly right outside the restroom, and asked Kelly to tell their supervisor Peggy that she was sick and was leaving.[1]

---

[1] Matheis testified at the single member hearing that she told Kelly that she had cut off her thumb but to tell Peggy that she was not feeling well. Kelly testified that Matheis asked if she could tell Peggy that she was not feeling well and did not say that she had been injured.

[3] Matheis clocked out at 2:46 p.m. and drove herself to the emergency room at Memorial Hospital and Health Care Center in Jasper, Indiana, where she was registered at 2:57 p.m. When Matheis arrived at the hospital, her thumb was attached by the skin. She reported that the accident occurred at home. The doctor completed the amputation of Matheis's thumb, and Matheis and her thumb were sent by air ambulance to Jewish Hospital in Louisville, Kentucky, for possible replantation of her thumb. Matheis arrived at Jewish Hospital at approximately 5:00 p.m. She stayed in Louisville for five days, but the attempted replantation was unsuccessful, and Matheis underwent an operation on January 26, 2015, for revision amputation at the interphalangeal joint level. She received a letter in the mail from Best Chairs stating that her employment was terminated effective January 21, 2015,[2] and her health insurance was cancelled.

[4] On March 27, 2015, Matheis filed an application for adjustment of claim. On March 28, 2016, a hearing was held before a single hearing member of the Board. At the hearing, the parties submitted a joint exhibit stipulating that Matheis sustained a complete amputation to her right thumb on January 21, 2015. Matheis testified that she had taken Lortab the morning of the accident for her shoulder, it was not prescribed to her, she obtained Lortab "[o]ff the

---

[2] Matheis testified that the letter stated she was terminated "because of I got two points for leaving without telling anybody. And then it would have been the third time I missed that month, so they added another point. So, I basically pointed out." Transcript at 34.

street," and she "would take a half of one at a time."[3] Transcript at 12. She indicated it did not affect her vision, balance, "judgment as far as how far this is from there," or ability to work or drive. *Id.* at 13. When asked why she asked Kelly to tell her boss that she was sick, Matheis testified "[b]ecause I was panicking and I didn't know what to do because I left because I just cut off my thumb" and "I didn't how [sic] to handle the whole situation because I knew I had Lortabs in my system and it just scared me." *Id.* at 18. Matheis indicated she was scared of losing her job and that her first fear was losing her thumb. She testified that she said at the hospital that her injury happened at home because she was "scared to lose [her] job because [she] left without doing proper procedures going through them." *Id.* at 22. She stated that she sent a text message from the hospital to Kevin Fromme, who was a supervisor at Best Chairs and the father-in-law of her sister, and the text message admitted into evidence shows that Matheis stated that she had "cut [her] finger on the bandsaw," she did not "want to go to imed," she was sorry for letting Fromme down, she had been taking pain pills, and she wanted him to know she was okay. Exhibits at 32. Matheis testified that Fromme was her sister's father-in-law and was like a father-in-law to her as well, and that she went back to work for another employer on April 1st.

---

[3] When asked "in your deposition you said you had taken it a week before or something," Matheis replied "I might have," "[i]t's been like a year," and "I was taking Lortab at the time because of my shoulder." Transcript at 12.

[5]     On cross-examination, Matheis indicated that she learned during her orientation that she was supposed to tell a supervisor if she became hurt at work and that she had been given an employee manual which forbid the use of prescription medication without a valid prescription. When asked "[a]s you worked at Best Chairs you learned that if somebody got hurt at work generally the place they would send you is this outfit called IMED; am I right," Matheis replied "[c]orrect." Transcript at 38. She further indicated that, after she left the restroom and spoke to Kelly, she picked up her lunch box and clocked out before traveling to the hospital, that the swiping mechanism is down the right-hand side of the time clock, her time card was in her lunch box, and she used her left hand to remove her time card and clock out. She stated that she had previously had a valid prescription for Lortab, and that she did not want Fromme to know she had been taking Lortab because she cared about what he thought of her. Matheis further testified that the trip from Best Chairs to her residence took about ten minutes, the trip from Best Chairs to the emergency room also took about ten minutes, that she left Best Chairs at about 2:45 p.m. and registered at the hospital at 2:57 p.m., and that she did not stop at home first and cut off her thumb.

[6]     Fromme testified that, on the night of January 21, 2015, he learned that Matheis had indicated that she injured herself at work and reported that fact to Joe Ficker, the division manager, and Margi Gilmore, the health environmental safety manager. He testified that he told Ficker that Matheis had cut her finger off at work, and Ficker wanted to know who Fromme called and what he was

going to do. Fromme stated he then called Gilmore and reported that he heard Matheis had cut her finger off at work, she asked what he was going to do, and he said he was going to go to the workplace to see if he could find anything. Fromme traveled to the plant, arriving between 9:00 and 9:30 p.m., and looked for blood but did not see any. Fromme also indicated there was a meeting at the plant on January 22, 2015, at which he, Ficker, Gilmore, and Kelly were among those present for some or all of the time, that Gilmore called and ran the meeting, and that there was discussion of the report that Matheis had stated she cut her thumb off at work. When asked if there was an investigation by the worker's compensation insurance company, Fromme answered "[n]o, not that I'm aware of." *Id.* at 78.

[7] Kelly testified that she saw Matheis after the break right outside the restrooms and that Matheis stated she was not feeling well and asked her to tell Peggy she was not feeling well. Kelly indicated she relayed the message to Peggy. Kelly further indicated that she later spoke to Matheis on the phone, that Matheis said she had lost her thumb, and that Matheis said at one point that it occurred at work and another point said it occurred at home. When asked "[h]ow was her voice when she asked you to tell Peggy" and "[w]as she screaming or was her voice quivering in any way," Kelly answered "[a] little bit." *Id.* at 97.

[8] On May 16, 2016, the single hearing member found that Matheis "suffered the laceration and amputation of her right thumb at work and that it arose out of her employment." Appellant's Appendix Volume II at 5. The single hearing member found that Matheis lied to personnel at Best Chairs and at medical

treatment locations because she feared termination; her fears flowed not from a belief she would be terminated because she was injured at work but because drug testing would reveal she was taking Lortabs that were not prescribed to her; and that she testified the injury occurred at approximately 2:40 p.m. The hearing member also found that she went to Memorial Hospital and Health Care Center in Jasper which is ten minutes from her work and registered for treatment at 2:57 p.m.; "[t]his renders it unlikely that [Matheis's] lie about the injury occurring at home could be true"; and Matheis testified she was aware "that IMed was the facility" where Best Chairs sent injured workers for care and she intentionally chose not to go there because she feared the drug testing. *Id.*

[9] The single hearing member's decision then stated that "the more difficult question in this case is whether [Best Chairs] should be held liable for the medical expenses incurred by [Matheis] in the face of her choice to pursue treatment outside of that she knew to be [Best Chairs'] preferred caregiver because she feared the results of the drug testing." *Id.* at 6. The single hearing member's decision then set forth Ind. Code § 22-3-3-4(d) and found that "[t]he need for treatment was clearly an 'emergency' (a thumb amputated by a band saw at work) but the need to choose her own care was not brought about by the emergency," that "[e]ven considering the state of mind which would normally attend such a shocking event, the Single Hearing Member is not inclined to remove from [Matheis] the consequence of her choice," and Matheis "retained the presence of mind to consider the impact of her drug use on her

employment." *Id.* The hearing member concluded that Best Chairs is not liable for the care provided at Memorial Hospital and Health Care Center.

[10] The hearing member went on to find:

> The medical record reveals that the care for [Matheis's] amputated thumb was not available in Jasper and she therefore had to be transported to Louisville for that specialty care. The Single Hearing Member is only barely persuaded that other good reason exists, therefore, for the provision of that care outside of [Best Chairs'] provision of it by way of the transportation to and treatment at Jewish Hospital in Louisville.

*Id.* The single hearing member found that Matheis began other employment on April 1, 2015, and is entitled to temporary total disability benefits for the period of January 22, 2015 until April 1, 2015, and an award for her permanent partial impairment of twelve degrees.

[11] Best Chairs filed an application for review by the full Board, the Board unanimously affirmed and adopted the decision of the single hearing member, and Best Chairs now appeals.

## *Discussion*

[12] The issue is whether the Board erred in affirming the decision of the single hearing member. In reviewing a worker's compensation decision, an appellate court is bound by the factual determinations of the Board and may not disturb them unless the evidence is undisputed and leads inescapably to a contrary conclusion. *Christopher R. Brown, D.D.S., Inc. v. Decatur Cty. Mem'l Hosp.*, 892 N.E.2d 642, 646 (Ind. 2008). We examine the record only to determine

whether there is any substantial evidence and reasonable inferences that can be drawn therefrom to support the Board's findings and conclusion. *Id.* As to the Board's interpretation of the law, an appellate court employs a deferential standard of review to the interpretation of a statute by an administrative agency charged with its enforcement in light of its expertise in the given area. *Id.* The Board will be reversed only if it incorrectly interpreted the Worker's Compensation Act (the "Act"). *Id.* The Board has a duty to issue findings that reveal its analysis of the evidence and that are specific enough to permit intelligent review of its decision. *Perkins v. Jayco*, 905 N.E.2d 1085, 1088 (Ind. Ct. App. 2009). We will not reweigh the evidence or assess witness credibility. *Id.* When reviewing a negative judgment, we will not disturb the Board's findings of fact unless we conclude that the evidence is undisputed and leads inescapably to a contrary result, considering only the evidence that tends to support the Board's determination together with any uncontradicted adverse evidence. *Id.* We will construe the Act liberally in favor of the employee. *Id.*

[13] Best Chairs argues there were no signs of blood found after the alleged occurrence and that Matheis did not tell anyone she was injured, walked to the restroom, did not tell Kelly she was injured, retrieved her lunch box, swiped her identification card down the right side of the time clock, and told medical providers that her injury happened at home. It argues that, because the Board made no findings on these topics and disputes, the evidence was insufficient to sustain the award. Best Chairs further asserts that, even if Matheis was injured at work, it should not be required to pay for her medical treatment and

transportation because the treatment was not sought because of an emergency or for any other good reason under Ind. Code § 22-3-3-4(d). It contends that "any emergency in obtaining treatment was removed once Matheis arrived at Jasper Memorial" and that the circumstances did not satisfy the "other good reason" language of the statute because Matheis acted in bad faith. Appellant's Brief at 21-22. It also asserts that Matheis stated in her deposition that she had not taken Lortab for probably a week before the accident and that it should be allowed to develop and present an intoxication defense to the Board at a hearing.

[14] Matheis argues that she suffered a traumatic injury at work, the Board's findings are supported by the testimony and medical records, the Board correctly found she suffered injury by accident arising out of and in the course of employment, and Best Chairs' attack on the sufficiency of the Board's findings is simply an invitation for us to reweigh the evidence. Matheis further maintains that it is difficult to imagine how such a traumatic event could not be considered an emergency and that Best Chairs raised the issue of an intoxication defense before the Board and there is no evidence of intoxication in the record.

[15] The Act provides for compensation of injury or death by accident arising out of and in the course of employment. Ind. Code § 22-3-2-2; *Wright Tree Service v. Hernandez*, 907 N.E.2d 183, 186 (Ind. Ct. App. 2009), *trans. denied*. The claimant bears the burden of proving the right to compensation. *Wright Tree Service*, 907 N.E.2d at 186. "As a general rule, the issue of whether an

employee's injury or death arose out of and in the course of his or her employment is a question of fact to be determined by the Board." *Id.* at 186-187 (citation omitted). "To 'arise out of' employment and therefore be compensable, there must be a causal connection between the injury and the worker's employment." *Global Const., Inc. v. March*, 813 N.E.2d 1163, 1168 (Ind. 2004) (citing *Milledge v. Oaks*, 784 N.E.2d 926, 929 (Ind. 2003)). *See Wine-Settergren v. Lamey*, 716 N.E.2d 381, 389 (Ind. 1999) (providing the "nexus is established when a reasonably prudent person considers the injury to be born out of a risk incidental to the employment, or when the facts indicate a connection between the injury and the circumstances under which the employment occurs").

[16] The risks incidental to employment fall into three categories: (1) risks distinctly associated with employment; (2) risks personal to the claimant; and (3) risks neither distinctly of employment nor distinctly personal in character. *Milledge*, 784 N.E.2d at 930. "Risks that fall within categories numbered one and three are generally covered under the [Act]." *Id.* However, risks personal to the claimant, those "caused by a pre-existing illness or condition unrelated to employment," are not compensable. *Id.* (citation omitted). "Risks in category number one are those we intuitively think of as work connected." *Id.* This category includes "[a]ll the things that can go wrong around a modern factory, mill, mine, transportation system, or construction project . . . and constitute the bulk of what not only the public but perhaps also the original drafters of compensation acts had in mind as their proper concern." *Id.* (citing 1 Arthur

Larson & Lex K. Larson, LARSON'S WORKERS' COMPENSATION LAW, § 4.01, at 4-1–4-2 (2002); *Mid-West Box Co. v. Hazzard,* 195 Ind. 608, 146 N.E. 420, 420-421 (1925) (employee's finger severed while operating machinery)).

[17] Here, the single hearing member and Board found that Matheis "suffered the laceration and amputation of her right thumb at work and that it arose out of her employment." Appellant's Appendix Volume II at 5. Matheis testified that she cut her right thumb off on January 21, 2015, using a band saw at Best Chairs, and that, after she returned from a work break at approximately 2:40 p.m., she took some scrap to cut on the band saw and, as she leaned over to shut the machine off, noticed that she had sustained a laceration to her right thumb. Fromme testified that Matheis clocked out at 2:46 p.m. and the hospital's records indicate that Matheis was registered at 2:57 p.m. Matheis testified she went straight to the emergency room at Memorial Hospital and Health Care Center in Jasper. When asked on cross-examination, "[s]o, after you got your lunch box, you removed your card from the lunch box with your left hand," Matheis responded affirmatively, and when asked "[a]nd then you reached across the time sheet and swiped it," she answered "[y]es." Transcript at 50. When asked "[w]hy did you take the time to do all of that," she answered "I don't know." *Id.* When asked if she left any blood on the time card, she answered that she did not think so, and when asked if she left blood in the area where she picked up her lunch box, she replied that she did not know. When asked on redirect examination "[d]id you stop at home and cut off your thumb first," Matheis answered "[n]o," and when asked "[d]id you bite it off in

the car on the way there," she again answered "[n]o." *Id.* at 62. She again indicated she "cut it off with a bandsaw at work." *Id.*

[18] Our review of the findings and conclusions of the single hearing member and Board and the evidence in the record does not convince us that the evidence leads inescapably to the conclusion opposite that reached by the Board. The single hearing member was able to assess the credibility of Matheis and the other witnesses and to consider the impact of the testimony regarding the lack of the presence of blood, the fact Matheis retrieved her lunch box and clocked out before traveling to the hospital, and the fact she reported at the hospital that the injury occurred at home. The single hearing member's decision included findings regarding the approximate time Matheis sustained her injury and the time she registered for treatment at the hospital and specifically found that "[t]his renders it unlikely that [Matheis's] lie about the injury occurring at home could be true." Appellant's Appendix Volume II at 5. We cannot say that the lack of additional, particular, or more specific findings by the single hearing member or Board regarding the lack of blood or Matheis's actions to clock out warrants reversal or remand. Based upon the record, we conclude substantial evidence and reasonable inferences that can be drawn from the evidence exist to support the determination that Matheis's injury arose out of and in the course

of her employment and that the findings of the single hearing member and Board were not inadequate in this respect.[4]

[19]   As for Best Chairs' argument that the treatment was not sought because of an emergency or for any other good reason, Ind. Code § 22-3-3-4(d) provides:

> If, because of an emergency, or because of the employer's failure to provide an attending physician or services and products, or treatment by spiritual means or prayer, as required by this section, or because of any other good reason, a physician other than that provided by the employer treats the injured employee during the period of the employee's temporary total disability, or necessary and proper services and products are procured within the period, the reasonable cost of those services and products

---

[4] To the extent Best Chairs argues it should be allowed to develop an intoxication defense, we note that Matheis testified she had taken Lortab on the morning of the accident for her shoulder, she took a half of one at a time, she had previously been prescribed Lortab, and that it did not affect her vision, balance, "judgment as far as how far this is from there," or ability to work or drive. Transcript at 13. Matheis's previous deposition, in which she had stated she had taken Lortab "[p]robably the week before," and portions of Best Chairs' employee handbook were admitted into evidence. Exhibits at 14. On cross-examination Best Chairs' counsel questioned Matheis regarding the provisions of the employee handbook related to prescription medications, where she obtained the Lortab, the fact she had previously used Lortab with a valid prescription, that when she did so the Lortab came with a warning not to operate machinery, and that Matheis did not know the dosage or how potent the pill she purchased off the street may be. The drug and alcohol testing policy set forth in the employee manual provides in part that employees are subject to drug testing in the event of a physical injury to the employee; that, if compelling circumstances exist which prevent an immediate report from being made, the report must be made as soon as possible and no later than twelve hours after the accident occurred; and "[i]f an employee is involved in a reportable accident, he/she will be asked to submit to drug and alcohol testing as soon as possible but no later than 32 hours after the accident." Exhibits at 23. We also observe that Matheis's injury occurred at about 2:40 p.m. on January 21, 2015, that Fromme's testimony reveals he informed Ficker and Gilmore of the injury prior to 9:00 or 9:30 p.m. that day, that there was a meeting on January 22, 2015, at which the report of Matheis's injury was discussed, and that Best Chairs does not point to evidence that it asked Matheis to submit to a drug test within thirty-two hours after the accident. We cannot say the single hearing member or Board was required to find that Matheis's injury did not arise out of and in the course of her employment due to her use of Lortab or that the Board was required to grant Best Chairs' request to introduce additional evidence.

shall, subject to the approval of the worker's compensation board, be paid by the employer.

The Indiana Supreme Court, in discussing the existence of good reason under the statute, has stated:

> [I]f the employee, without authorization but in good faith, obtains medical treatment different from that provided by the employer, and it is determined that the treatment provided by the employer was inadequate treatment for the employee's condition and the unauthorized treatment received by the claimant was medically reasonable and necessary treatment, the employer should be responsible, notwithstanding the lack of prior approval by the employer.

*Daugherty v. Indus. Contracting & Erecting*, 802 N.E.2d 912, 918 (Ind. 2004) (quoting *Shenandoah Prods., Inc. v. Whitlock*, 421 S.E.2d 483, 486 (Va. Ct. App. 1992)).

[20] The single hearing member and Board found that Best Chairs was not liable for Matheis's care provided at Memorial Hospital and Health Care Center. The single hearing member's decision went on to find, however, that "[t]he medical record reveals that the care for [Matheis's] amputated thumb was not available in Jasper and she therefore had to be transported to Louisville for that specialty care" and that "[t]he Single Hearing Member is only barely persuaded that other good reason exists, therefore, for the provision of that care outside of [Best Chairs'] provision of it by way of the transportation to and treatment at Jewish Hospital in Louisville." Appellant's Appendix Volume II at 6. The record reveals Matheis's testimony that she sustained the laceration to her

thumb after she returned to work from a break at approximately 2:40 p.m., she clocked out at 2:46 p.m., she drove herself to Memorial Hospital and Health Care Center in Jasper, and the hospital's records indicate that Matheis was registered at 2:57 p.m. Matheis testified that, when she arrived at the hospital, her thumb "was hanging by a little piece of the skin" and "[t]hey cut it off when I got to Jasper and they put it on ice." Transcript at 127-128. She indicated they placed her thumb "on ice and sent [her] and [her] thumb to Louisville" where doctors "tried to reattach the whole thumb" but "it died before it worked." *Id.* at 128. When asked "what did they do for you at the hospital in Jasper," Matheis testified "[t]hey said they couldn't do anything there and had to send me to Louisville" and that she was flown to Louisville by helicopter. *Id.* at 22.

[21] The contents of the medical records admitted into evidence are consistent with Matheis's testimony. Medical records from Memorial Hospital and Health Care Center in Jasper dated January 21, 2015, stated: "Right thumb: complete amputation present . . . . The thumb is hanging by a small skin bridge. The tip is insenate and without blood flow . . . ." Exhibits at 49. The records further stated: "Course of Care: . . . the amputation was completed and thumb was prepared for transport. The patient was sent by air ambulance to the hand surgeons in Louisville Kentucky." *Id.* The medical records from Jewish Hospital in Louisville stated that Matheis had been "transferred via helicopter for possible replantation of the right thumb," that she had "moderate active bleeding PTA per flight crew," and that she was transitioned to the operating

room. *Id.* at 56, 61. An operative report indicated an operative procedure of "[r]eplantation right thumb at interphalangeal joint," the date of the procedure of January 21, 2015, and the operate time was "18:51 to 1:50." *Id.* at 64. Subsequent records stated that the replantation failed and that Matheis underwent a procedure on January 26, 2015, for "[r]evision amputation at the interphalangeal joint level." *Id.* at 73.

[22] We cannot say, based on the evidence and in light of our deferential standard of review and that we construe the Act liberally in favor of the employee, that the single hearing member and Board were not permitted to infer from the evidence that the medical treatment available at IMed was inadequate for Matheis's condition and that the treatment received by Matheis at Jewish Hospital was medically reasonable and necessary. Substantial evidence and reasonable inferences there from exist to support the Board's finding that care for Matheis's thumb was not available in Jasper and she had to be transported to Louisville for that specialty care and thus that other good reason existed for the provision of that care. We do not disturb the findings or the determination of the Board.

### *Conclusion*

[23] For the foregoing reasons, the judgment of the Board is affirmed.

[24] Affirmed.

Vaidik, C.J., and Bradford, J., concur.